This time we'll hear Martin v. Quartermain. Good morning, Your Honors. Jeremy Lieberman for Appellants from Pomerantz LLP. I think we could focus, Your Honor, really on two fundamental errors in law that the District Court made in issuing its decision. One is the District Court found, with respect to the statements made regarding whether or not Strathcona was on board and agreed to alter the bulk sampling program, and whether or not those were actually fulsome, seeing the court rule that they were correctly, but rule that there wasn't scienter. The court correctly ruled that these statements were false and misleading because the company had stated that planning was underway with Strathcona to alter the program, when in fact Strathcona had disagreed with altering it. Did they ever alter it? They did alter it. Oh, sure, absolutely they altered the program. They had drilled down—it was a public fact that they altered the program. They stopped—they had drilled down on the specific Cleopatra vein to get more gold there, and that was a major alteration of the program. There's no dispute that they altered the program. I thought that the sampling remained the same, though. The sampling did—well, the bulk sampling program continued, but there was a drilling down on the program. No, that's not what I asked you. I asked you if the bulk sampling program remained the same. Did it remain the same? Did they alter where they were taking the bulk samples from? The overall area? No. The alteration of the program is the drilling down on the Cleopatra vein, continuing to focus on that area as a discrete area. And so the question is not whether or not they did that. They did do that. There's no dispute. Maybe I'm misunderstanding, because as I understood it, the bulk sampling program was designed to try to assess the viability of the project, and there were projections made by Snowden as to what that sampling would produce. And ultimately, then there would be projections as to the commercial viability of the mine, right? That's correct, yes. And at the same time that they were actually excavating rock and getting ready to assess how many ounces of gold came out of every ton of rock that was crushed and then refined, they were doing additional drilling down with regard to examining samples of the strata within the area in which the bulk sampling was occurring. That's correct. And as a result of that drilling, they found the Cleopatra vein, which was an extraordinarily rich vein of gold or gold approaching more substantial quantities of a half a meter in length. That's correct. And they announced that, and that they continued to do drilling with regard to that vein, because it was a deep vein, but that they didn't alter the sampling that was done with regard to the bulk sampling. Am I wrong about that? There was never a plan. The bulk sampling program is a program as to what you're going to drill down on. And so there was an alteration of the program to change the program to continue to drill down on that intersect. And so that is an alteration of the program. And there was a statement made by the company that that planning is underway with Strathcona to continue to drill down and focus on that intersect. The only problem was, as part of the bulk sampling program, to see whether or not there was viability. That was a statement made. Right. Okay? And the statement is made to that. Only problem is that Strathcona is not on board. Strathcona, at the outset, does not... What difference does that make? I mean, the substance of the disclosure is they're focusing on where they have disclosed they're going to focus. I think Strathcona's view was that that probably was the only part of the mine that was viable. Turned out not to be so, and then it turned out maybe to be so. Who knows? It's hard to predict the future. But why does it make a huge difference whether Strathcona was in on the planning or not in on the planning? Because Strathcona's the qualified expert. They are overseeing the bulk sampling program. And it's just, they're the ones who are ultimately going to sign on to the program. And so if Strathcona doesn't agree with how this sampling program is being done, that's a very material fact. They're the ones overseeing the program. If they don't bless the results of this program, they're simply... Then those results shouldn't be issued. They're going to be the ones that, in a sense, they're the auditor of this program. And they disagreed with how the program was being run now because they found this very narrow vein, and their view was it was too narrow of a vein to be representative of the rest of the area. Wasn't that already disclosed, that they're focusing on the Cleopatra vein? Not that Strathcona had believed it was unrepresentative. And it actually turned out that 60 percent of all the gold in the entire Valley of Kings came from that one Cleopatra vein. And so Strathcona's view was, you're going to focus on this very narrow sample, which actually isn't capable of bulk mining, and we don't agree. We don't agree this is the way to do the bulk sample. And they're warning them, we don't agree. And the court actually correctly observed that that was a material misstatement. The court ruled that. And the court ruled that they knew it was false when it was made. And the court correctly ruled that. What the they had told the public about details of the Cleopatra vein, which were accurate. Previously, correct. Right. But the issue is, is whether or not Strathcona agrees with how they're conducting it. Let's say, let's say there's an audit occurring. If the richest vein is right there, then it seems to me perfectly sensible to concentrate there. And that's what, that's what was disclosed. If you actually look at what an, what an investor cares about, there's a, there's a very rich vein and that's where you focus. And what would Strathcona recommend? That, that, that you go somewhere where there isn't gold? No, that you, you, it would be, that Strathcona was saying is it was senseless to focus on that vein because it was in, you were unable to do bulk sample mining on it. It simply was useless. Strathcona's, when it resigns, it talks about methodology and the statements it makes that we disagree with the methodology that Snowden used. And they don't really specifically say we did, we were, we disagree with the fact that planning was underway at that particular time. Well, what they say is that, what they say is that we were, that, that they did not agree that that was an appropriate, that that was an appropriate method, plan to drill down on that unrepresentative sample. And, and, and so then we could focus on that where the court agreed there was a false statement, the court agreed it was knowingly false, but the court said, well, they gave some other details that were correct about Cleopatra, so therefore it is not scienter. That is actually not the standard. The standard is, is if you make statements that are knowingly false, that's it. Novak says that's, that's, you have scienter on that statement. But there's another issue that the, where the court clearly made a mistake in our view, Your Honor, is that the court is saying these results are confirming the feasibility study and the 2012 resource report. They're making that statement. Now, the question is whether or not, there's a question whether or not these are opinions or they're not opinions. Let's assume for the moment. They kind of sound like opinions. Well, let's assume. We're talking about something that's still in the ground. Let's assume for the moment, so let's assume for the moment they are opinions. No problem. Under Omnicare, if you have contravening information that you're aware of, if you're making a statement that you have, you're under regulatory compliance, but your attorney, your in-house attorney is telling you you're not, you are under a duty under Omnicare, it's law, it's law of all courts now, under Supreme Court, you are required to disclose that. And that's, and the court here ruled that was applicable. And so the court then rules as a whether you are in compliance with a regulation is not something that has to do with something that is unknown and in the ground and subject to competing analysis. I mean, there could be gold under this building. And so the issue is, is, is, is, but there's a, we wouldn't know, would we? But when you're making a statement that it confirms that you, that, that, that this is commercially viable and you're, you're only independent expert is saying it is not commercially viable, come clean to the public. It's no problem for you to hold a contrary view, but you should disclose the, the contrary view that the, that you're, that you're here, you're, you're expert has. And that is, that is required by Omnicare that you do that. All the court says is that they needed time to analyze. You alleged that your claim rests on three statements. We're talking about one of them. Yeah. Well, but, but, so, so, so one of them deals with whether or not the Strathcona was on board and whether or not there was a material misstatement with respect to that. We believe it is. The court agreed that it was. The court said that they, I think of that as the third statement. Okay. And then, so the second statement is whether or not it's confirming the results, um, whether or not these, whether or not the, the bulk sample was confirming the results of the feasibility study and the 2012 resource reports. There, that applies under Omnicare. The court had held that they, they did have a duty to disclose Strathcona's contravening opinion. When you make a statement that you're about, about any matter and you have facts that are available to you that contradict that statement, under Omnicare, you need to disclose that. If it rises to the level of materiality, the court agreed that. Why isn't it right to characterize it as they had an opinion about what was going to, uh, be produced and what, what it would show? And they had another expert that had a different opinion. And they, all they needed to do was disclose what that expert's opinion was. It was such a, this is not just another expert. This is the, this is the independent expert on the bulk sample. If you're making statements about, about the bulk sample and its viability and you have the, the only expert that's going to be, sign on to this telling you, come clean, it's not viable, that, that, therefore you have a duty to disclose that. And so all they, if they want to keep their opinions to themselves as to viability, they have every right to do so. But once you give information to investors, to the market, you have a duty to be completely transparent. You can't just selectively think what you think the results are when you have a, um, an expert telling you actually the results are completely false. And so if they wanted to, if they wanted to be completely transparent, they could have given the results, they could have said, we believe that these confirm this, the study, yet our independent expert believes to the contrary. And what they did was, was, was even more misleading. They would make these statements. They would say it confirms the feasibility study and the resource report. And then they went ahead and said, oh, and our auditor, our auditor, by the way, is Strathcona, implying that Strathcona agreed. That, that, that's the implication. At the very least, you're not disclosing that Strathcona strongly disagrees. And the court there actually did agree that that was a material fact, but the court said they needed time to analyze, um, Strathcona's opposing views. That's fine, but don't make a statement then. There was no duty for, for, for the, for Pretty to make a statement, for defendants to make a statement. Don't make any statement until you can give full disclosure to investors. And here they chose to make certain statements that gave a false and misleading impression, and then, and then they only disclosed their, um, the, the, the problems that, uh, that Strathcona had when Strathcona resigned, because Strathcona thought they were being fraudulent. That, that, that, that is the clear inference of the case. And so if you're giving a representation regarding a state of affairs, regarding how the bulk sample's performing, that's fine if you think it's your opinion. It's fine for you to state your opinions, but if there is a, here, a, a very credible source, the, here, the expert, the one who's going to sign onto the bulk sample program, and he says, no, we disagree, this is not working out, this is not commercially viable, you must disclose it. I don't see anywhere in the, in the law where there's room to not disclose it, particularly under, under Omnicare now. And I'll leave the rest of time for rebuttal. Oh, you've, uh, you've reserved time for rebuttal. Thank you. I have. Yes, we have. Yes. Thank you very much. Thank you. Okay. Uh, good morning, Your Honor. Dan Kramer from Paul Weiss for the, uh, defendants appellees, uh, predium. Uh, let me just address the couple of arguments that, uh, Mr. Lieberman, uh, made. Uh, let me start with the, um, uh, argument about Omnicare and, uh, Strathcona. Omnicare said, if you're going to state an opinion, you have to do a reasonable inquiry and have a reasonable basis. The issue in Omnicare was that there was an allegation that the company made a statement about its legal exposure, either without having consulted a lawyer or possibly having consulted one who disagreed. And the court found that under that, those sets of allegations, there was a, a significant issue over whether the company had done a reasonable inquiry and had a reasonable basis. But in Omnicare, what the court says is, let's assume that the company had gone to multiple lawyers and one of those lawyers, uh, uh, disagreed. One of those lawyers said, I don't think you're in compliance. And the others did. The court said, depends on context, but that may be just fine. Uh, and you mean to, to, to, to, uh, uh, avow as a company, the opinion of one expert, knowing that one lawyer, knowing that another lawyer does not agree. That's right. Because what the company is saying and what Pretium was saying is we're mining this area. We think it's going to take us 22 years to complete the mining. We are going to give you an estimate of what we think the amount of gold will be. That estimate they disclosed is speculative. It's based on, uh, uh, a number of assumptions. People can disagree and we may be wrong. That's, that's what this company said. And here, the resource estimate, the principal expert was Snowden. Snowden was responsible for the resource estimate, not Strathcona. And the resource estimate was relied upon by Tetra Tech and AMC, two other independent experts who had to rely on it to the feasibility study. Strathcona had the role of doing a bulk sample, taking a chunk of the mountain, right? And analyzing it. So with the goal of trying to have the sample represent the various mineral deposits of, of, of low to high grade mineralization of gold that might appear within the area represent, I mean, it's like trying to understand how much gold is in our hills. You know, it's exactly right. Your honor. I mean, you're standing on the surface and say, what's beneath me. Right. If you're in Western New York, you know, a huge vein of salt is at 500 feet. Uh, but there's no, that there's not certainly in gold as there isn't salt, but what were the projections made by Soden based upon, uh, uh, results that were expected to be issued its resource report in November, 2012, which is 13 months before the completion of the bulk sample, the bulk sample hadn't even been started, what they thought it would produce because exactly a projection with what they thought was there. Right. So, so they did their testing. And as part of their testing, what Snowden said is here's our estimate. And one of the things we recommend is that the company also do a bulk sample. We'll see the, we'll analyze that result and we'll recheck it. And during the course of the bulk sampling, were there a series of data points that began to appear with regard to what the expectation vis-a-vis the expectations of what they might have been? Right. So I'll tell you what the record shows on that. The record shows number one, the company announced that it was not going to disclose anything in the sample until the sample was done. Okay. Completed. And they said, we think it'll be at the end of the year that they announced this in June-ish of 2013. They say, we think it'll be at the end of the year. We'll disclose it when it's done. By the time Strathcona resigned, there were zero results from the processing mill of the bulk sample. None. Zero. There was 20% of the sample mill. So let me explain the difference. So with the bulk sample, you're taking 10,000 tons out of the mountain, crushing it and processing it, right? And it's those results that you're going to try and figure out how it compares because the mountain is not homogenous, right? The mountain's not homogenous. You take the 10,000, you hope it's representative, you crush it up, you take a look and you see what's there. They also had a sample tower that had half of 1% of that, and they were taking samples along the way. And according to the record, 20% of the sample results occurred by the time Strathcona resigned. And so Pretium looked at that and said, you know, what we're trying to get is a sense of whether the bulk sample supports the resource estimate. We get that it's variable. We get that there are high areas of mineralization, low areas, and if you just take a modest sample, you could be wrong high or low. And so what they said they were going to do is let's wait till the sample is done. Let's wait till December and we'll assess our resource estimate. As it turns out, December, which is two months after the end of the class period, Strathcona's resigned. Other experts come in to finish it and the estimate of the gold goes up, not down. It goes up. So the bulk sample, when done, supported and Snowden reaffirmed the resource estimate. Well, then it went down. Years later, it went down again. But as of December, so the question is, what's the gold? It's all variable. If the question is what's in your mind, right? When you're making the resource estimate, what's the information you have? You have the Snowden resource estimate, which is accepted by Tetra Tech and AMC. Strathcona doesn't like the methodology and resigns, but Strathcona hasn't done the work on the bulk sample. And when that's done, the gold estimates increase. It's the methodology which serves as the basis for Strathcona. Correct. And as opposed to looking at a series of results going along and they say, wait, this doesn't add up to what Snowden was thinking. Right. So the head of Strathcona gave a press conference and it's in the record. And in the press conference, he doesn't say we disagree with the data. He says the data will show what the data will show when it's all done. He said we had a methodological difference. Okay, that's fine. Three experts are comfortable with the resource estimate. One expert before doing its work has a methodological difference. But what do you say to your adversary's argument that, all right, 10 people in a row think the methodology is fine, but Strathcona thinks it's a problem. And yet the press release says that Strathcona is with the drill. That is not an incorrect statement. Yeah. So it's not an incorrect statement. Let's go to the planning is underway. Plaintiffs take that statement and says planning is underway means they're on board and they agree. That's what he stood up and told the court. That's what he wrote in his papers. Well, that's not true. Planning is underway doesn't mean it's on board and agree. I'm planning my wife's birthday party. Planning is underway. We're having discussions about it. I don't think we're going to have a dinner in New York. It better come up good. Right. I don't think we're going to have the dinner in New York that the kids want to have. I think we're going to go on a family vacation. All right. Planning is underway for the dinner, but it may not happen. Nobody's going to invest a great deal of money depending on which restaurant you select. And no one is, based on the statement, planning is underway. And there's no scienter and there's no loss causation. There's nothing in the disclosures here that led to the stock drops that had anything to do with planning is underway. And by the way, it wasn't a false statement. What the judge below did was he inferred something. He said, because Strathcona at some point between June and October disagreed with the methodology of the resource estimate, I'm going to infer that back in July and August, it was not engaging in planning. This is months before it resigns, engaged in planning with Pretium. I think that's an improper inference. And there's no basis in the record to find that in July and August when the statement was made. This is a motion to dismiss. So available inferences are drawn in favor of... Yes, but from facts, from facts, not from conclusory statements. And there's no fact they allege. The only fact they allege is Strathcona eventually resigned over a methodological difference. That fact, in our view, Your Honor, does not support an inference that planning is underway. When they're still on the job and they're still dealing with the bulk sample, that planning is underway is a false statement. And then there's no scienter and there's no loss causation. Doesn't that suggest that whatever it is the company's doing, Strathcona is on board? No, but what it suggests is that they're... Ready to bail out. That they're discussing. It suggests exactly what it says. Planning is underway doesn't mean we have a decision, we have a plan, we have a program. What it suggests is that they're in discussion. And the fact is it takes two more months before Strathcona resigns. I think you can infer from that that they in fact were in discussions. I think the proper inference is exactly the opposite. And let me go back, if I may, to Omnicare and to Tung, this court's ruling in Tung. So in Omnicare, the court says, look, you have to have a reasonable basis and do reasonable inquiry. And if you ask a bunch of lawyers and one says, I don't think this is legal, and the others say it is legal, you don't have to disclose the one lawyer's point of view. One lawyer says it's illegal, and the other one says it's legal. Well, actually in Omnicare, that's what the lawyer was saying, is it's illegal. And the court, I understated my own case, right? And Omnicare said, that's fine. In Tung, it's not just the expert, it's the regulator who is going to have to approve the drug. And that regulator is saying to the FDA, for 10 years, we think you have a methodological problem with your clinical trial because it's single blind and not double blind. 10 years, FDA is telling that. And what does the company say? Not, I have an estimate, it could be right, it could be wrong, or whatever it is. The company says, 90% assurance, we're going to get approval by a certain target date. 90% assurance, in the face of the FDA repeatedly saying, we have an issue with the methodology of your trial. And under those circumstances, this court said, that doesn't have to be disclosed. So our case is way easier than Tung, and fits right in Omnicare. The principal expert on the other experts agree with them. One expert, based on a philosophical methodological difference, disagrees. Under Omnicare, and under Tung, that is not required to be disclosed. And then we also have, your honor, Sienter. In a nutshell, what the methodological difference was, I mean, it seems to me, if you're going to take a couple tons out of the mountain and grind it up and look at what it is, what's the difference in methodology? The question is, how do you extrapolate from it? The question is, when you look at the entire area, the entire Brusteck project and Valley of the Kings area, which is very big, the question is, how do you extrapolate from the results you're getting to the mountain as a whole, given that it's not a homogenous mountain? And it's very difficult, it involves a lot of judgment and analysis, and in Kleinman, this court said, Kleinman and Tung, we are simply not going to have differences about interpretation of data become a basis for 10B cases. It's just not what we're going to do. It all depends on context, I suppose, and your adversary uses the analogy of, this is like the independent auditor who starts his work and then he says, I don't agree with these financial projections, and that, you could say, might appear pretty important to disclose. Right. So the auditor here was Snowden. The resource estimate was Snowden's. Strathcona had no role in the actual resource estimate. They were doing a side project, which at the end you might address, but I quite agree with you, with the auditor analogy. The auditor here is Snowden, and if Snowden had changed his mind, this would be a very different case. The other thing I will say is Strathcona resigned before any milling results for the bulk sample, and with only 20% of the small sample tower. And Pretium said, we just don't think you have enough information to say this. And by the way, you can mislead shareholders with premature statements. Here, what the courts are saying to companies is, if you do a reasonable inquiry, you have a good faith basis, we are not going to second-guess all of your opinions and judgments. It's just a terrible rule to get into. It just, it means that companies are really at risk of any minor thing leading to Tembi liability, and that's just not where the courts have gone. Thank you. Thank you. We'll hear rebuttal. Your Honor, the statement that it was simply a methodological difference, and that was the difference between Strathcona and the company, is completely false and completely unsupported by the record. It wasn't the methodology that was a problem, it was the actual results. I quote from Strathcona, we told Pretium that from all the drilling they've done, and it's a heck of a lot of drilling, with that sample tower results and so on, none of those came anywhere close to finding a grade of 16 grams per ton, which is what allows bulk mining methods. There's further had been developed with regard to the drilling. 20%? It was, by the time they had resigned, it was more than 70%. 70% was done by July of 2013. That's where in the record? That's in the complaints. We can pull up. In June 2013, there were 20%. When you come to July, July 23, 2013, it's 70%. You're much further along by October. These are facts, analysis facts that come back and don't match up with the Snowden projections with regard to what the yield would be, right? What Strathcona is saying is we've gone through the drilling. We've gone through, and we're over 70% of the drilling. We're analyzing it. We've done a heck of a lot of drilling, and you're not getting 16 grams per ton. They're telling them that. What they're telling investors, because you're telling investors that the results are confirming the resource report. You're talking about 70% of the drilling. You could do 100% of the drilling. The question is what percent of the analysis had been done of the kind that Strathcona was retained to do? Obviously, Strathcona had believed that they had done a significant amount of analysis. They said they've looked at the drilling, and they said there's been a heck of a lot. You just said a significant amount. You said 70%. 70% of the drilling had been done. How much had they analyzed? I understand there's a difference between the drilling and the analysis. You could have a huge pile of mountains sitting in the middle of this room and not know anything. And so all Predam had to do was tell investors is that we've just started this. Strathcona strongly believes we're not getting close to 16 grams per ton, but we believe that's the case, but they didn't do that. And here when we talk about it, when we talk about the auditor, when it comes to the bulk sampling program, that's the statements at issue in this case are the bulk sampling program, and there's results. There's only one auditor in the bulk sampling program. That auditor is Strathcona. Predam is a resource report. The auditor of the program, which is the statements at issue, that is Strathcona. One other issue, when we talk about Omnicare and we talk about the attorney, the Omnicare talks about two different types of attorney. If it's a senior attorney, that's something that should be disclosed to investors. If it's a junior attorney who says that you're not in compliance, that's not something that needs to be disclosed. Usually it's the junior attorneys who know everything. That is true, Your Honor. When it comes to the bulk resource model, when it comes to those results, Strathcona is clearly the senior attorney. It's the senior auditor, and it's the only auditor. It believed that it had gone through a heck of a lot of drilling. It believed a heck of a lot of analysis had been done, and it believed it got nowhere to 16 grams per ton. The company had decided to give a completely different view to investors. They had every right to do so, but they had every obligation to give the contributing opinion as well. Thank you. Thank you both. We'll reserve decision. The next case on calendar is United States v. DeVos. We're taking that on submission. The case of United States v. Rivera is taken on submission, and the case of Jones v. Tompkins is taken on submission. That's the last case on calendar. Please adjourn court. Thank you, gentlemen.